## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MARSHONDA FUGETT,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 14-2291-JAR** |
| **SECURITY TRANSPORT SERVICES, INC.,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Marshonda Fugett brings this action against her former employer, Defendant Security Transport Services, Inc. ("STS"), alleging claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, and the Kansas Act Against Discrimination ("KAAD"). Before the Court is Plaintiff's Motion for Summary Judgment (Doc. 86), where she argues that findings made by the Kansas Department of Labor awarding her unemployment benefits are binding as to the claims in this case; and Defendant's Motion for Summary Judgment (Doc. 88) on the merits of Plaintiff's claims. The motions are fully briefed and the Court is prepared to rule. For the reasons explained in detail below, the Court denies Plaintiff's motion for summary judgment and grants in part and denies in part Defendant's motion for summary judgment. Defendant's motion is granted on the sexual harassment claim and denied on the retaliation claim.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[10] When the moving party also bears the

burden of proof at trial,

> a more stringent summary judgment standard applies. Thus, if the
> moving party bears the burden of proof, to obtain summary
> judgment, it cannot force the nonmoving party to come forward
> with "specific facts showing there [is] a genuine issue for trial"
> merely by pointing to parts of the record that it believes illustrate
> the absence of a genuine issue of material fact. Instead, the moving
> party must establish, as a matter of law, all essential elements of
> the issue before the nonmoving party can be obligated to bring
> forward any specific facts alleged to rebut the movant's case.[11]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a

specific exhibit incorporated therein."[12] Rule 56(c)(4) provides that opposing affidavits must be

made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13]

The non-moving party cannot avoid summary judgment by repeating conclusory opinions,

allegations unsupported by specific facts, or speculation.[14]

"Where, as here, the parties file cross motions for summary judgment, [the Court is]

entitled to assume that no evidence needs to be considered other than that filed by the parties, but

summary judgment is nevertheless inappropriate if disputes remain as to material facts."[15]  Cross

motions should be considered separately.[16]  Just because the Court denies one does not require

---

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11]*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(c)(4).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[16]*Ultra Clean Holdings, Inc. v. TFG-Cal., L.P.*, 534 F. App'x 776, 780 (10th Cir. 2013) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

that it grant the other.[17]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[18]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[19]

## II.    Uncontroverted Facts

As an initial matter, the Court admonishes both parties for failing to follow the federal and local rules governing summary judgment practice.  While both parties present inappropriate legal arguments and conclusory assertions in their statements of fact, the Court is particularly discouraged by the vexatious presentation of facts in Defendant's memorandum in support of summary judgment and reply memorandum.[20]

Defendant presents 476 numbered statements of fact in its opening brief, spanning 65 pages.  To be sure, there is no page limit in this district for presentation of factual material in briefs; only for the argument section.[21]  But Rule 56.1(a) requires a "concise statement of material facts as to which the movant contends no genuine issue exists" in the supporting memorandum to a motion for summary judgment.  Defendant's opening brief does not meet this requirement.  Not only does it present an excessive amount of factual averments by any objective standard, its presentation is completely disproportionate to the complexity of legal and factual claims at issue in this case.  Plaintiff alleges two claims: sexual harassment and retaliation.  The

---

[17]*Id.*

[18]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[19]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[20]Docs. 90, 97.

[21]D. Kan. R. 7.1(e).

facts giving rise to these claims occurred over a less than seven-month time span.  The claims are neither lengthy in terms of duration, nor in terms of scope, and do not justify the 65-page recitation of facts by Defendant.  The Court notes that Defendant's *second* "Statement of Facts" section in the opening brief, in an attempt to summarize the preceding 65-page recitation, is just over two pages—a synopsis that attempts to point the Court to the truly material facts in dispute here.[22]

Nor did Plaintiff's mere 39-paragraph statement of additional facts in her response justify a reply brief comprised of 76 pages of additional factual material.  Defendant's response to Plaintiff's statement of additional facts is replete with argument and non-responsive factual assertions that largely had been covered in Defendant's opening brief.[23]  Defendant's overkill approach to the factual record has required the Court to expend excessive time and effort identifying and disregarding facts that are repetitive, duplicative, immaterial, conclusory or argumentative.

Finally, the Court must note both parties' failure to properly label and/or index the exhibits cited in support of and in opposition to summary judgment.[24]  But the sheer amount of exhibits submitted by Defendant, makes it virtually impossible for the Court to locate Defendant's referenced exhibits in the record.  Defendant's Index of Exhibits,[25] listing 12 numbered exhibits, bears no relation to the 104 attachments to that Index, which are *all* labeled in CM/ECF as "Exhibit."[26]  Most of these attachments have no label at all.  The Court will not

---

[22]Doc. 89 at 65–67.

[23]*See* D. Kan. R. 56.1(c), (e).

[24]Plaintiff failed to include an exhibit index, but her exhibit citations at least correspond to the attachment numbers used in CM/ECF, allowing the Court to locate the cited exhibits.

[25]Doc. 90.

[26]*See* Doc. 90.  For example, Exhibit 1 is the February 2013 Affidavit of Thomas Baumnann.  It is listed as Item 3 on the Index and filed as attachment 4.  Item 2 on the Exhibit List is the Deposition of Marshonda Fugett.  In

dig through these 104 unlabeled attachments in order to locate Defendant's many citations in the

476 statements of fact. Given the myriad failures to abide by the rules of summary judgment

practice, the Court deems the facts presented by Defendant controverted to the extent Plaintiff's

exhibits are easily identifiable and Defendant's are not.[27] The Court encourages defense counsel

to carefully review the local rules and guidelines concerning summary practice and to follow

both the letter and the spirit of those rules in the future.[28]

With these observations in mind the Court determines that the following material facts

are uncontroverted, stipulated to, or viewed in the light most favorable to the nonmoving party

for purposes of summary judgment.

Defendant STS is a business that transports convicted felons, prisoners, fugitives,

mentally ill patients and other persons requiring secure transportation from one secure location to

another secure location, including federal courthouses, state courthouses, prisons, jails, hospitals,

and juvenile detention centers. Defendant employed Plaintiff, a Caucasian female, at its Topeka,

Kansas location from on or about November 5, 2012, until November 1, 2013, as a Transport

Specialist. She was an employee at-will. A Transport Specialist drives prisoners from one

secure location to another. Upon being hired by Defendant, Plaintiff received an Employee

Handbook which contained copies of Defendant's Standard Operating Procedures ("SOP"),

including the STS Policy Prohibiting Sexual Harassment, SOP 004-106. She also signed and

---

the brief, this deposition is cited with a number/letter exhibit label, e.g., "Exhibit 2C." But attachment number 2 to Doc. 90 is the Affidavit of Michelle Brokaw, which is item 7 on the Index. Excerpts from Marshonda Fugett's deposition are filed in scattered single page attachments that bear no exhibit sticker or other label, which the Court only learned by opening each attachment until it located pages from Fugett's deposition transcript. It appears that all deposition transcript excerpts were filed in this manner. And there are multiple versions of affidavits submitted by Defendant. Some are filed as separate docket entries and some are attached to the Exhibit Index.

[27]Fed. R. Civ. P. 56(c) (allowing the Court to issue "any . . . appropriate order" where a party fails to properly support an assertion of fact).

[28]D. Kan. R. 56.1, 7.1; District of Kansas Guidelines and Orders, *available at* http://www.ksd.uscourts.gov/rules-sub-page/; *see also* Fed. R. Civ. P. 1; *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

initialed the STS Driver Availability Policy.  That policy required Plaintiff to acknowledge that "I understand that 40 hours per week is not guaranteed due to work fluctuations."[29]

Thomas Baumann is the President of Defendant STS.  He has the sole authority to hire employees, terminate employees, discipline employees, reassign employees to other positions, assign wages, suspend employees from work, and investigate any violations of company policy.

Deb Ponton is an employee of Defendant STS, and has been employed in various positions by the company since April 22, 2003.  In 2013, she was employed as a "Lead In-State Transport Coordinator."  During Plaintiff's tenure at STS, there were seven other employees who worked as transport coordinators.

Every other Saturday, the Transport Specialists fill out an availability sheet, letting the Coordinators know the days they are available to work.  Each morning, the Coordinator creates a manual call list based on the availability sheets.  The Coordinator notes all of the drivers available that day, and how many hours they have already worked.  The Coordinator contacts the drivers from that list depending on the amount of hours they have already worked, and depending on the type of "run" that is required; some runs require drivers of a certain gender, or more than one driver, and there is a rule limiting the amount of hours a driver can drive in a day. The shift coordinator passes along to the next shift coordinator the list of drivers that have not yet been used, but are available.  Ponton typically works a 7:00 a.m. to 3:30 p.m. shift on Monday through Friday; she typically worked that shift during Plaintiff's tenure at STS.

Plaintiff asked not to work with several employees for transport runs during her tenure. She asked not to ride with Frank Viscosky based on safety concerns about his age and driving ability.  She asked not to ride with Paul Gilbert because he had been rude to an elderly lady,

---

[29]Doc. 90-4 at 13, Baumann Aff., Ex. C.

although she ended up riding with Gilbert anyway after making the request.  She refused to work

with Paul Friegos, or Tim Cable.  Larry Jassa and Jeff Jacobs refused to work with Plaintiff.

Under the Revised SOP, which became effective in March 2013, an employee is required

to report any alleged sexual harassment directly to Baumann for investigation.  And under the

March 2013 revision, sexual harassment includes same sex sexual harassment.  On June 12,

2013, Plaintiff orally complained to Baumann and Kotich of sexual harassment by Ponton.  She

complained of three specific instances.  First, on or about May 15, 2013, Ponton made a remark

to another employee named Angela Jaindl, in Plaintiff's presence at the STS main office, that the

two "should take Marshonda to the dark side."  Plaintiff and another employee who was present,

Greg Robinson, knew that Ponton and Jaindl were homosexual.  Plaintiff told Ponton that she

was straight and asked her to stop making such comments.  Second, on May 20, 2013, Ponton

said to Plaintiff, "so you are not going to come to the dark side and have fun with me."  Plaintiff

again told Ponton that she was straight, and asked her to stop making such comments.  Robinson

also witnessed this comment.  Third, sometime between May 15–20, Ponton made a remark to

Plaintiff about how she would get in trouble with her partner for doing certain acts to Plaintiff.

She did not specify to what acts she referred.  Plaintiff also reported to Baumann that Ponton's

stage name at drag shows was "Jess-Licks-a-lot-of-Puss."  Plaintiff claims Ponton told her about

this stage name at the office.  Ponton never touched Plaintiff.[30]  The comments made Plaintiff

irritated, uncomfortable, and embarrassed.

Baumann investigated Plaintiff's complaint on June 12 after consulting with General

---

[30]Plaintiff refers to the comments several times during her deposition as "gestures," but when pressed, Plaintiff did not assert that Ponton engaged her in a physical manner, nor did she describe any hand gestures or other physical act by Ponton.

Counsel A.J. Kotich.[31]  Baumann questioned Ponton, who denied making the statements, and

Jaindl, who denied hearing the dark side comment.  Baumann did not interview Robinson at the

time, although on a later date, Robinson discussed the May 15 incident with Baumann.

Baumann concluded that Ponton was more credible; he believed Ponton and not Plaintiff.

Baumann and Kotich counseled Ponton about not using inappropriate language that could

be interpreted as sexual harassment, told her that Plaintiff had a right to make her allegations,

and not to retaliate against Plaintiff.[32]  They asked Ponton about Plaintiff's hours and wanted to

know if she had been cutting them back.  Ponton assured them she was not.  Baumann placed a

written report of his findings that Ponton's conduct did not amount to sexual harassment into

Ponton's personnel file.  Plaintiff reached out to Baumann eventually about the status of the

investigation because Baumann had not followed up with her.  Baumann informed her that he

concluded that there had been no sexual harassment.

Plaintiff cannot recall the date, but sometime after June 12, Ponton invited Plaintiff to a

drag show in Springfield, Missouri.  The invitation made Plaintiff uncomfortable.  Plaintiff

declined and told Ponton to stop making sexual gestures and overtones.  Robinson witnessed this

exchange.

Six STS employees, including Plaintiff and Robinson, signed a letter of complaint

---

[31]Plaintiff repeatedly refers to this deposition testimony from Baumann as evidence that "Defendant witnesses have previously lied, under oath, in prior self-serving affidavits."  *See, e.g.*, Doc. 94 at 57.  The deposition testimony does not establish that Baumann "lied under oath," nor that "Defendant witnesses" previously lied under oath.  The cited testimony consists of impeachment testimony; Baumann was asked about whether he had consulted Kotich about how to complete a sexual harassment investigation.  He said he had counseled Kotich for other reasons, but not about how to complete a sexual harassment investigation, but Plaintiff's counsel pointed him to an earlier-executed affidavit where he stated that he did consult Kotich for this purpose.  This is a credibility issue that is not for the Court to weigh on summary judgment.

[32]Plaintiff purports to controvert this fact with Ponton's deposition testimony.  But the cited-to testimony does not support the contention that Baumann did not tell her not to retaliate. That testimony related to the initial contact by Baumann during the investigation when he told Ponton that Plaintiff had accused her of sexual harassment.  Doc. 94-3, Ex. 3 at 28:19–25.  Baumann states in his affidavit that he later told Ponton not to retaliate against Plaintiff.  Doc. 90-4 at 4, Baumann Aff. ¶ 46.  The Court must accept this statement as true for purposes of summary judgment.

regarding Ponton, dated June 17, 2013.  Robinson typed the letter and Plaintiff contributed to its substance.  The letter complains, inter alia, that Ponton treated drivers abusively, that she gave certain drivers preferential treatment in assigning runs based in part on sexual orientation, that Ponton used sexual innuendo and comments to female drivers who are not sexually oriented as she is, and that several employees are considering leaving the company based on Ponton's conduct.  Baumann received the letter on July 1, 2013.  He issued a letter to the six employees who signed the June 17 letter, asking them to bring any specific complaints directly to him.  He told them that if he did not hear back from them by July 8, he would conclude that the complaints in the letter did not pertain to them specifically.  Plaintiff recalls complaining to Baumann about Ponton between July and October "probably a dozen and a half times."[33] Plaintiff was intimidated and threatened by Baumann's response to her complaints; she maintains that he screamed and cursed at her when he confronted her about the June 17 petition.

Baumann determined that a refresher training course on sexual harassment should be provided to all employees, so Kotich conducted a training course on July 9, 2013.  At this training, employees were provided written materials on sexual harassment and hostile work environment issues.  Thirteen employees, including Plaintiff and Robinson, attended this training session.  Plaintiff recalls Kotich speaking during the session, and that he looked directly at her and stated that if an employee ever wanted to file "something on Security Transport," he "never loses anything."  Plaintiff felt threatened and intimidated.

On September 25, 2013, Larry Jassa, another Transport Specialist, filed an incident report with STS.  In the report, he claimed that he had been assigned a run with Plaintiff and that Plaintiff complained to him about Ponton favoring certain workers and not giving her the hours

---

[33]Doc. 94-2, Ex. 2 at 200:10-11.

she wanted.  Jassa reported that Plaintiff told him, "I'd like to beat Deb 'til she turns back in to a woman."  The two were on a run to a hospital, and Jassa reported that the nurses at the hospital believed Plaintiff was being rude, disrespectful, and unprofessional.  Jassa filed another report that same day, stating he had been told by other employees that Plaintiff was trying to get them to write reports about Ponton.  Jassa also filed a report on October 9, 2013, informing STS that Plaintiff had told him about the petition circulating to get Ponton terminated, that she contributed to many of the items on the list, and that she told him that he and his girlfriend Brittany Tyson had signed the petition.  Jassa reported that neither he nor Tyson had in fact signed the petition, so Plaintiff's statement indicated to him that their signatures must have been forged.  Plaintiff denies the allegations in Jassa's reports and maintains that she witnessed Jassa and Tyson sign the petition.[34]  Additionally, Ponton filed eight different complaints or incident reports about Plaintiff between January and September 2013.  Other transport coordinators complained as well about Plaintiff's rudeness, and repeated calls to them asking when she would be assigned runs and how far down on the list she was, requiring them to repeatedly explain their rotation process to her.

On or about September 25, 2013, Plaintiff filed a Complaint against Defendant with the Kansas Human Rights Commission ("KHRC") complaining of the unlawful employment practices, including discrimination on the basis of her sex, sexual harassment, and retaliation.  Defendant was served with the complaint on September 30, 2013.

Sometime in early October 2013, Plaintiff and Ponton were discussing a run assignment when a box full of keys fell on Plaintiff's hand.  The parties controvert whether Ponton

---

[34]Plaintiff objects to the Jassa reports as hearsay.  But the Court finds that they meet the business records exception to the hearsay rule.  Fed. R. Evid. 803(6); *see* Doc. 168 ¶¶ 9, 32–34.  They may also be statements by a party opponent since Jassa is an employee of STS.  Fed. R. Evid. 801(d)(2).  Moreover, the Court can consider these reports to the extent they are not offered for the truth of the matter asserted, to show that Jassa made these reports to STS.  Fed. R. Evid. 801.  Plaintiff's hearsay objections are thus overruled.

intentionally threw the box at Plaintiff.

The Transport Coordinators try to give as many STS drivers forty hours of work per week or less to keep labor costs down, although the drivers routinely work more than forty hours per week.  STS pays its employees time and one-half for working more than forty hours per week.  According to STS's payroll records, Plaintiff worked regular and overtime hours for all pay periods paid between May 13, 2013 and October 18, 2013.  During this period, she worked between 77 and 80 regular hours per two-week pay period for all but one pay period: June 28, 2013.  For this pay period, she worked 62 regular hours and 10.5 hours of overtime.

Plaintiff contends that her hours declined in October 2013.  On October 8, 2013, Plaintiff called Baumann while he was traveling out of state and asked him whether he had reviewed information she had provided to him suggesting she was not getting paid for all of her overtime worked.  She shouted at him, telling him that it had been three weeks, and ultimately hung up on Baumann.  Baumann told Plaintiff that he had not seen the information to which she was referring, and told her that he would be back in the office on October 10.  Plaintiff did not make an attempt on October 10 to meet with Baumann, but did call him at about 6:00 p.m.  He told her that he had not found the information she said she had left for him.  Plaintiff argued with Baumann, and told him that Ponton had thrown a box at her.  On October 14, 2015, Plaintiff and Defendant agreed to resolve the wage dispute.  They signed a letter agreement acknowledging that Defendant did not believe Plaintiff was owed a greater amount of wages, but nonetheless agreed to pay Plaintiff an additional $32.00 in order to resolve the matter.  The letter agreement memorializes that STS believed Plaintiff was properly paid for the dates in question, but that it was agreeing to settle the matter in order for it to be concluded.

For the pay period paid on October 4, 2013, Plaintiff worked 80 regular hours and 19.25

overtime hours.  For the pay period paid on October 18, 2013, Plaintiff worked 78.5 regular hours and 14.25 overtime hours.  On October 28, 2013, Plaintiff orally complained to Baumann that other female Transport Specialists, Melinda Parschall and Ana Frieden, were getting offered runs when she was not.  Baumann explained to her that business was down from the previous month, and told Plaintiff to put in writing who she claimed was getting more hours, and that he would look into it.  Baumann asked Michelle Brokaw, an STS payroll officer, to look into Plaintiff's complaint.  Brokaw reviewed the payroll records that she had prepared and determined that for the pay period of October 12–25, 2013, which was paid on November 1, 2013, Plaintiff worked 55.5 regular hours—more than Frieden and Parschall.  She also worked more hours than seventeen other transport specialists and fewer hours than six other transport specialists.  During her final pay period that was paid on November 15, 2013, Plaintiff worked 14.75 regular hours.[35]

Plaintiff resigned on November 1, 2013.  She claims that after she reported the sexual harassment in June 2013, and after being served with the KHRC Complaint on September 30, 2013, her hours were docked, she was treated differently than other similarly situated employees, and Ponton "and other officers and employees" spoke poorly about her and the complaint she had lodged, calling her a "liar."

After leaving STS, Plaintiff applied for unemployment benefits, contending that she was subject to harassment and that there was no other reasonable alternative but to quit her job.  The Kansas Department of Labor ("KDOL") issued a determination on November 21, 2013, that Plaintiff qualified for benefits under K.S.A. § 44-706(a)(7), which provides that an individual is not disqualified for unemployment benefits where they leave work because of "unwelcome

---

[35]This paycheck was for hours worked between October 26 and November 1, 2013.

harassment of the individual by the employer or another employee of which the employing unit had knowledge and that would impel the average worker to give up such worker's employment." STS appealed this decision and the Unemployment Insurance Referee issued a written decision affirming the examiner's initial determination that Plaintiff qualified for unemployment benefits. The referee opined that "claimant was subjected to unwelcome harassment including verbal or physical conduct of such a nature that it had the purpose of unreasonably interfering with an individual's working environment. . . .  [T]he employer could have taken a reasonable course of action either through discipline or termination in handling this situation."[36]

STS appealed the referee's decision to the Employment Security Board of Review.  The Board adopted the findings of fact made by the referee and affirmed the decision on April 14, 2015.  STS has appealed this decision to the District Court of Shawnee County, Kansas; it is currently pending.

## III.   Discussion

Plaintiff moves for summary judgment, arguing that the KHRC decision awarding her unemployment benefits because she was subject to unwelcome harassment that caused her to leave her employment binds this Court to enter judgment in her favor on the sexual harassment and retaliation claims.  Defendant moves for summary judgment on the merits of Plaintiff's sexual harassment and retaliation claims under Title VII and the KAAD.[37]

### A.   Collateral Estoppel

Plaintiff urges that the KDOL findings require this Court to enter summary judgment in her favor.  Defendant argues that the issues are not the same, and that the administrative

---

[36]Doc. 87-3, Ex. 3.

[37]The same standards that apply to Plaintiff's Title VII claims apply to her KAAD claims. *See Swackhammer v. Sprint/United Mgmt.*, 493 F.3d 1160, 1174 n.7 (10th Cir. 2007).

decisions should not be given preclusive effect.  Plaintiff's position is foreclosed by the United

States Supreme Court's decision in *University of Tennessee v. Elliot*,[38] which held that federal

courts are not allowed to give preclusive effect to judicially unreviewed decisions by a state

agency in Title VII actions.[39]  Here, it is undisputed that although the agency decision has been

appealed, there has not yet been judicial review of that decision.  For this reason alone, the Court

may deny Plaintiff's motion.

Even if a state court judgment was entered affirming the KDOL findings, the Court

would not give the KDOL referee's findings preclusive effect in this case.  Judicially reviewed

administrative decisions may be given preclusive effect where: (1) the law of the state where the

prior judgment is rendered would give the judgment preclusive effect; and (2) if the party against

whom preclusion is asserted had a full and fair opportunity in the state court proceedings to

litigate the claims.[40]  There is no question that Kansas courts would apply the doctrine of

collateral estoppel to a state court judgment if one is entered on the KDOL appeal.[41]  Under

Kansas law, preclusion may apply to findings and final decisions of

> (1) administrative agencies with adjudicative powers (2) to decide
> the particular issue (3) when the decision is actually a judicial, and
> not an administrative or managerial, decision; (4) in a proceeding
> providing due process protections; if (5) the issue has been fully
> litigated.[42]

---

[38]478 U.S. 788 (1986).

[39]*Id.* at 796; *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 476 (1982); *see Stone v. Dep't of Aviation*, 290 F. App'x 117, 125 n.3 (10th Cir. 2008) (explaining that a state agency decision requires a state court judgment in order to be preclusive as to a Title VII claim).

[40]*Kremer*, 456 U.S. at 481–82.

[41]*See, e.g.*, *Jackson Trak Grp. Ex rel. Jackson Jordan, Inc. v. Mid States Port Authority*, 751 P.2d 122, 127 (Kan. 1988).

[42]*Kester v. Shawnee Mission Unified Sch. Dist. No. 512*, 252 F. Supp. 2d 1180, 1190 (D. Kan. 2003) (quoting *Woodard v. Jefferson Cnty.*, 18 F. App'x 706, 712–13 (10th Cir. 2001)).

This Court follows Judge Rogers' reasoning in *Gutierrez v. Board of County Commissioners of Shawnee County, Kansas*,[43] that Kansas courts would not give preclusive effect to unemployment compensation referees' factual determinations in a Title VII case.  First, the purpose of an unemployment benefits hearing is to determine whether an employee is disqualified for unemployment benefits, not whether the employer engaged in misconduct.  "An unemployment compensation benefits referee is concerned with forbidden conduct by the employee, while this court in this case is concerned with forbidden conduct by the employer."[44] And second, the procedures utilized in unemployment benefits hearings are not similar to court hearings—they are informal and the rules of evidence do not necessarily apply.[45]

Moreover, for collateral estoppel to apply, the issues decided by the KDOL and this Court must be the same.[46]  The Court finds that the issues presented to the KDOL were not the same as those presented in this case.  Here, while the referee concluded that Plaintiff was subject to "unwelcome harassment," under K.S.A. § 44-706(a)(7), it did not consider this question in the context of a sexual harassment claim under Title VII and the KAAD.  The referee's opinion referenced dictionary definitions in construing the term "Harassment," and acknowledged that sexual harassment under federal employment discrimination statutes can fall into one of two categories: (1) quid pro quo; or (2) hostile work environment.[47]  But the referee made no findings as to the severity or pervasiveness of the harassment, whether the harassment was because of Plaintiff's sex, or whether the harassment altered the terms of her employment such that it

---

[43]791 F. Supp. 1529, 1533–34 (D. Kan. 1992).

[44]*Palmer v. Leawood S. Country Club, Inc.*, No. 97-2515-KHV, 1998 WL 724050, at *7 (D. Kan. Sept. 9, 1998); *Gutierrez*, 791 F. Supp. at 1533 (explaining the difference in purpose between unemployment benefits proceedings and discrimination cases).

[45]K.A.R. § 48-1-4(a); *see Gutierrez*, 791 F. Supp. at 1533.

[46]*See, e.g.*, *Umholtz v. Kan. Dep't of Soc. & Rehab. Servs.*, 926 F. Supp. 2d 1222, 1232 (D. Kan. 2013).

[47]Doc. 87-3, Ex. 3 at 2–3.

created an abusive working environment.  These elements are required on Plaintiff's claims under the federal and state discrimination statutes as discussed in the next sections of this opinion.  Importantly, there were no findings at all that related to the retaliation claim alleged in this case, nor any findings as to whether Plaintiff was constructively discharged.  As such, the Court would not apply collateral estoppel even if the KDOL findings had been judicially reviewed and affirmed because the administrative decision does not address the same issues presented by the claims in this case.  Plaintiff's motion for summary judgment therefore must be denied.

### B.    Sexual Harassment

Count I asserts a claim of "sexual harassment and hostile working conditions/hostile working environment."[48]  Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."[49]  A plaintiff may establish a Title VII discrimination claim by showing that the sexual harassment has caused a hostile or abusive work environment.[50] In order to establish a prima facie case of sexual harassment under a hostile work environment theory, Plaintiff must show that she was subjected to unwelcome harassment based on her sex and that, due to the harassment's severity or pervasiveness, the harassment altered a term, condition or privilege of his employment and created an abusive working environment.[51]

### 1.    Based on Gender

Defendant argues that there is an absence of evidence that Ponton's harassment was

---

[48]Doc. 81 ¶ 4.a.

[49]42 U.S.C. § 2000e-2(a)(1).

[50]*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986).  Plaintiff does not assert a claim of quid pro quo sexual harassment, the other way a plaintiff can establish sexual harassment under Title VII.  *See id.*

[51]*Hollis v. Acoustic Sounds, Inc.*, No. 13-1083-JWL, 2014 WL 806190, at *4 (D. Kan. Feb. 28, 2014) (citing *Kline v. Utah Anti-Discrimination & Labor Div.*, 418 F. App'x 774, 780–81 (10th Cir. 2011)).

based on Plaintiff's gender.  In *Oncale v. Sundowner Offshore Services, Inc.*,[52] the Supreme Court held that both opposite-sex and same-sex sexual harassment is actionable under Title VII, but that such harassment violates Title VII only when it is "because of sex."  The term "sex" under Title VII refers to a class delineated by gender.[53]  Thus, even for same-sex sexual harassment claims, "[i]f the nature of an employer's environment, however unpleasant, is not due to [his] gender, [he] has not been the victim of sex discrimination as a result of that environment."[54]  Workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations."[55]  Title VII is not "a general civility code for the American workplace."[56]  Instead, the critical issue in determining whether harassment is because of sex is whether members of one sex are subjected to a disadvantage to which the other sex is not.[57]

The *Oncale* Court established three ways a plaintiff can establish same sex harassment: (1) if the harasser was homosexual and motivated by sexual desire; (2) if the harassment was motivated by a general hostility to the presence of a particular gender in the workplace; and (3) if the harasser treated men and women differently in the workplace.[58]  It is undisputed that Ponton is gay, and her sexual orientation was well known around the office.  Plaintiff testified that she believed  Ponton's comments were motivated by sexual desire and Robinson corroborates this understanding.  Indeed, the Court finds that a reasonable jury could construe the "dark side," and

---

[52]523 U.S. 75, 79-80 (1998).

[53]*Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2006) (citing *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997)).

[54]*Id*. (quoting *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994)).

[55]*Id*. (quoting *Oncale*, 523 U.S. at 80).

[56]*Id*.

[57]*Id*.

[58]*Id*. (citing *Oncale*, 523 U.S. at 80-81).

other comments made by Ponton to be based on sexual desire, and not literal statements about the Star Wars franchise.  The Court cannot conclude as a matter of law that Ponton's comments had nothing to do with gender.[59]

Plaintiff maintains that other gender neutral conduct by Ponton, Baumann, and Kotich contributed toward the hostile work environment.  She complains of being cursed at, intimidated, called a liar, that a box was thrown on her hand, and that her hours were docked, all as part of the hostile work environment.  Where both gender-based and gender-neutral conduct is alleged,

> The question then becomes whether Plaintiffs can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment.  Our precedents say that they can: "Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct."  *O'Shea*, 185 F.3d at 1097.  This is because what is important in a hostile environment claim is the environment, and gender-neutral harassment makes up an important part of the relevant work environment.  Conduct that appears gender-neutral in isolation may in fact be gender-based, but may appear so only when viewed in the context of other gender-based behavior.  *Penry*, 155 F.3d at 1262.  Thus, when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, "reasonably could view all of the allegedly harassing conduct ... as the product of sex and gender hostility," then "it is for the fact finder to decide whether such an inference should be drawn."  *O'Shea*, 185 F.3d at 1102, 1097 (emphasis omitted).[60]

A jury, viewing all of this evidence in context, could not reasonably find that the gender-neutral alleged harassment in this case was the product of sex and gender hostility.  Plaintiff does not proffer evidence that this treatment was based on her sex; that female and not male

---

[59]*See Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1222, 1239 (D. Kan. 2007) (citing *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998)).

[60]*Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).

employees experienced this treatment. Indeed, Plaintiff repeatedly cites Greg Robinson's testimony that he suffered similar treatment by Ponton, at least insofar as his hours being reduced. Instead, the record is replete with complaints against Plaintiff by Ponton and many others about her attitude, and about her repeated calls to the coordinators for runs, requiring them to explain their rotation system to her. There were also complaints made by another transport specialist who claimed Plaintiff was difficult to work with, and who refused to work with her. Plaintiff is able to point to no other evidence of either (1) other female transport specialists who were treated the same way after making similar complaints; or (2) similarly situated men who were not subject to this treatment. The Court therefore is unable to find that the alleged gender-neutral harassment in this case could be considered by a reasonably jury as the product of sex and gender hostility.

2.   **Severe or Pervasive**

Plaintiff must also show that her work environment was objectively and subjectively severe or pervasive.[61] Whether the harassment is objectively "severe or pervasive," is determined from the totality of the circumstances after "considering such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[62] This objective inquiry focuses on the perspective of a "reasonable person in the plaintiff's position, *considering all the circumstances*,"[63] and requires "careful consideration of the social context in which particular behavior occurs and is

---

[61]*Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

[62]*Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

[63]*Morris*, 666 F.3d at 664 (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007)).

experienced by its target."[64]

In requiring a showing of a workplace permeated by severe or pervasive discriminatory conduct, the Supreme Court struck a balance between two extremes, creating "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[65]  In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII was not meant to be a "general civility code."[66]  "'[S]imple teasing,' . . . offhand comments, and isolated incidents (*unless extremely serious*) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[67]  On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[68]

There is no dispute that Plaintiff subjectively believed that Ponton's comments to her in May and June 2013 were severe and pervasive, and that they involved sexual innuendo.  But Defendant argues that Ponton's conduct was not objectively severe or pervasive.  Defendant argues that the conduct was infrequent—there were only three statements made within a three-week period of time.  It argues Plaintiff was not touched, nor was the behavior physically threatening.  Finally, Defendant urges that the conduct did not unreasonably interfere with her work performance.

It is undisputed that Ponton did not make any gestures toward Plaintiff, nor did she

---

[64]*Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

[65]*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[66]*Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citations omitted).

[67]*Id.* (citation omitted and emphasis added).

[68]*Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir. 2001) (citation omitted).

physically touch Plaintiff.  Plaintiff urges that viewing the facts in the light most favorable to her, the frequency of Ponton's sexual commentary was pervasive.  Plaintiff contends that Ponton made sexual remarks to her, including describing sexual "things" Ponton would do to Plaintiff and that she wanted to "have fun" with Plaintiff.  However, both Plaintiff and Robinson testified during their depositions that while they understood the "dark side," and "getting into trouble" comments as having a sexual context, Ponton did not state any specific sexual acts that she wanted to engage in with Plaintiff.  In addition to those non-specific comments, Plaintiff alleges that Ponton invited her to a drag show, and that she told her one day at the office that she had the stage name, "Jess-Licks-a-lot-of-Puss."[69]  While this particular comment is explicit, it is but one isolated offensive comment.  Plaintiff and Robinson testified that Ponton routinely engaged in explicit sexual discussions around the office, but they only provide the three examples already discussed.

Plaintiff claims that Ponton threw things at her and cussed at her.  This conduct caused Plaintiff to cry at work, and caused her embarrassment.  Although Plaintiff testified that both Ponton and Baumann yelled and cursed at her, she only provides one specific instance— Baumann's response to the June 17 petition that she helped draft.  A plaintiff cannot make a sufficient showing of a hostile work environment by showing only isolated incidents of sporadic slurs; it must be a "steady barrage of opprobrious comments."[70]  Plaintiff's testimony is insufficient under this standard.

Construed in the light most favorable to Plaintiff, the evidence is that over a three-week period, Ponton made three comments of a sexual nature that were offensive to Plaintiff.  These

---

[69]The parties dispute whether this occurred.  Baumann contends that Plaintiff told him she knew about this stage name from attending one of Ponton's drag shows.  Plaintiff contends that Ponton shared this information with her at the office.

[70]*Morris v. City of Colo. Springs*, 666 F.3d 654, 666 (10th Cir. 2012) (quoting *Chavez*, 397 F.3d at 832).

incidents, taken as a whole, do not show a pervasive use of gender-based discrimination such that the conduct would unreasonably interfere with plaintiff's work environment.  The incidents were not physically threatening or humiliating, occurred infrequently, and were not severe.  Indeed, while Ponton's comments can certainly be construed as offensive, the environment taken as a whole does not reflect a hostile work environment under the statutory standards.  There were clearly incidents of offensive utterances, but nothing took place that was so humiliating as to be abusive.

Plaintiff felt backlash from Baumann and the other employees based on her complaints on June 12 and June 17.  While there is no dispute Plaintiff found these incidents offensive, there is no evidence that they unreasonably interfered with her work performance.  Although she testified that the conduct interfered with her work assignments, she does not explain how.  The record reflects that up until early October, she was consistently given close to forty regular hours per week, plus overtime.  So even if the reduction in Plaintiff's hours is considered part of the harassing conduct, it was not pervasive.  Plaintiff's hours were not reduced before October, despite the many complaints in the record about her by Ponton and others that she was disruptive and called the coordinators too much asking for her status on runs.

The Court also does not find that the isolated incidents here amount to "severe" conduct when viewed objectively.  Courts that have found isolated conduct to nonetheless be severe when the conduct is especially egregious or extreme, such as with sexual assault.[71]  Aside from the box incident with Ponton, it is undisputed that the conduct at issue here involved no physical contact.   And the box incident is highly controverted.  Several witnesses, including Ponton, contend that it was an accident.  Aside from this incident, there is no allegation of any physical

---

[71] *See id.* at 667–68 (collecting cases).

contact between STS employees and Plaintiff.  The Court cannot find that the isolated incidents of inappropriate comments rise to the level of severe.

Plaintiff has not pointed to evidence in the record that would create a genuine issue of material fact about whether the alleged conduct was sufficiently severe or pervasive such that it created an abusive work environment.[72]  Drawing all reasonable inferences in favor of Plaintiff, a reasonable jury could not conclude that she was subjected to a hostile work environment.  STS is therefore entitled to summary judgment on Plaintiff's claim of sexual harassment.[73]

### C.      Retaliation

Title VII makes it unlawful to retaliate against an employee because the employee has opposed any practice made unlawful by Title VII, or because the employee has "participated . . . in an investigation, proceeding or hearing."[74]  In the absence of direct evidence of retaliation, the court assesses retaliation claims under the *McDonnell Douglas* burden-shifting framework.[75] Under this burden-shifting structure, plaintiff must first establish a prima facie case of retaliation. If she does so, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision.  From there, the burden returns to plaintiff to show that the stated reason is pretextual.[76]  Plaintiff does not present direct evidence of discrimination, so the Court considers her claim under the *McDonnell Douglas* framework.  Defendant argues

---

[72]The Court recognizes that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is 'quintessentially a question of fact.'" *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).  When a plaintiff makes allegations that could not constitute a severe and hostile work environment even if believed by a jury, however, the court may enter summary judgment against the plaintiff.

[73]Because plaintiff cannot establish a prima facie case of sexual harassment, the Court need not address Defendant's argument that it has established the affirmative defense set out in *Faragher*, 524 U.S. at 775.

[74]42 U.S.C. § 2000e-3(a).

[75]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005).

[76]*Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

that summary judgment should be granted because: (1) Plaintiff cannot establish that she suffered an adverse employment action; (2) Plaintiff cannot establish a causal connection between any protected activity and an alleged adverse employment action; and (3) Plaintiff cannot show that Defendant's nonretaliatory explanation for its adverse employment action was a pretext for retaliation.

### 1.    Prima Facie Case

The elements of a prima facie claim of retaliation under Title VII are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[77]   The parties do not dispute that Plaintiff engaged in protected opposition to discrimination when she filed her KHRC Complaint on September 25, 2013.

#### a.    Materially Adverse Action

Defendant first argues that Plaintiff cannot establish that she suffered an adverse employment action.  In order to constitute an adverse employment action in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[78]   Plaintiff argues that she suffered an adverse employment action when she was constructively discharged, and when her hours were reduced in October 2013.

To establish constructive discharge, Plaintiff must show that "working conditions became

---

[77]*McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[78]*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (6th Cir. 2006)).

so intolerable that a reasonable person in the employee's position would have felt compelled to resign."[79]  The plaintiff's burden is substantial,[80] and her subjective views of the situation are not relevant.[81]  Whether a plaintiff was constructively discharged is a question of fact, and "judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation."[82]

Viewing the evidence in the light most favorable to Plaintiff, she filed her KHRC complaint in late September after an internal investigation at STS resulted in no discipline for Ponton.  Plaintiff felt that her previous complaint had been ignored by Baumann, and she felt intimidated by Baumann and Kotich after complaining in May about Ponton's conduct.  Plaintiff believed she was not getting called for as many runs by the end of October, and the tension at STS between herself and Robinson on one side, and Ponton and the STS management on the other, was getting worse.  Plaintiff claims that she was subjected to cursing by Baumann and Ponton, and that Ponton threw a box of keys on her hand.  Nonetheless, there is no evidence that the working conditions were so intolerable that a reasonable person in Plaintiff's position would feel compelled to resign.  It was only Plaintiff's second to last pay period that fell below the 77 regular hour norm.  There had been no sustained reduction in her hours from the typical 77–80 regular hours, plus overtime, she had been working prior to the end of October.  And when Plaintiff confronted Baumann in October about what she believed was a pay discrepancy, he agreed to settle the dispute for an additional $32.00 payment, despite his calculation showing that Plaintiff was due a lesser amount.  There was no indication that Plaintiff was criticized for her

[79]*Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).

[80]*Strickland v. U.P.S.*, 555 F.3d 1224, 1228 (10th Cir. 2009).

[81]*Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 915 (10th Cir. 2012).

[82]*Id.*

performance, or that her job driving secure vehicles was made intolerable for any other objective reason by November 1, 2013.  Although Plaintiff's poor relationship with Ponton and Baumann may have made resigning "her best option," she has not presented a genuine issue of material fact that she had no other choice but to resign.[83]  For these reasons, Plaintiff's resignation did not amount to a constructive discharge, and was therefore not an adverse employment action.

Plaintiff also claims that the reduction of her hours in October 2013, was an adverse employment action.  It is undisputed that Plaintiff's hours were consistently between 77–80 hours per two-week pay period up until the October 12–25, 2013 pay period, when they were 55 hours.  Defendant argues that this decline was not an adverse employment action because Plaintiff was never guaranteed to work forty hours per week, and because the decline in hours was due to Plaintiff's refusal to work with certain other drivers, and due to her failure to accept certain run assignments during this time period.  While it is true that Plaintiff signed an acknowledgment at the beginning of her employment with STS that she understood she was not guaranteed to work forty hours per week, in practice, Plaintiff had consistently worked about forty hours per week, often with overtime, during the course of her employment.  The 55 hours she worked during the October 12 pay period was a significant reduction of her typical hours. The Court finds that a reasonable employee would have found the reduction of Plaintiff's hours from 80 to 55 hours per pay period materially adverse.[84]  The extent to which the reduction was due to Plaintiff's refusal to accept certain runs during that time period is a genuine issue of material fact.  Plaintiff denies in her affidavit and deposition testimony that during this pay period she refused several of the runs to which Defendant claims she refused, that she told STS

---

[83]*Baca v. Sklar*, 398 F.3d 1210, 1218 (10th Cir. 2005).

[84]*See, e.g.*, *Glover v. Heart of Am. Mgmt. Co.*, 38 F. Supp. 2d 881, 887 (D. Kan. 2003) (finding reduction of one hour per day is an adverse employment action).

she was unavailable, or that she failed to answer the phone when Defendant called to offer her runs.  Moreover, although Defendant has come forward with evidence that Plaintiff refused to work with certain drivers, there is no indication that these refusals account for any significant number of missed runs.  Viewing the evidence in the light most favorable to Plaintiff, these conflicts would have been present before the October 12 pay period when Plaintiff was receiving full regular time plus overtime hours.

       b.     Causal Connection

Defendant argues that there is no causal connection between Plaintiff's protected activity and the materially adverse employment action.  To satisfy the causation element of her prima facie case, Plaintiff must show "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[85]  A showing of close temporal proximity between the alleged events, in itself, may satisfy the causation requirement.[86] The Tenth Circuit has held that a one and one-half month period between events may establish causation, while a three-month period, standing alone, is insufficient to establish causation.[87] Here, Plaintiff filed her KHRC Complaint on September 25, 2013, and STS was provided notice of the complaint on September 30, 2013.  The reduction in Plaintiff's hours occurred less than two weeks later during the pay period beginning on October 12.  This evidence is sufficient to satisfy the causation element of Plaintiff's prima facie case.

---

[85] *O'Neal*, 237 F.3d at 1253 (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)).

[86] *Id.*

[87] *Id.*

2.      **Pretext**

Defendant asserts that to the extent Plaintiff's hours were reduced in late October 2013, it was for legitimate nonretaliatory reasons: STS was trying to keep its labor costs down by reducing hours and spreading out the drivers' regular hours, Plaintiff had declined certain offers for runs, and her request not to work with certain employees disqualified her from other runs. Defendant has thus articulated legitimate nonretaliatory reasons for the reduction in Plaintiff's hours.  Therefore, to defeat summary judgment, Plaintiff must show that there is a genuine dispute of material fact as to whether Defendant's explanations for the adverse employment action are pretextual.[88]  To raise a fact issue of pretext, plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.[89]  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[90]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[91]

Plaintiff argues that Defendant's explanation for the reduction of hours was inconsistent and at times false.  As to Defendant's first explanation, that Defendant was trying to reduce

---

[88]*Proctor v. U.P.S.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (citing *Mickelson v. New York Life Ins. Co.* 460 F.3d 1304, 1318 (10th Cir. 2006)).

[89]*Id.* (citing *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206-07 (10th Cir. 2000)).

[90]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[91]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

overtime and spread out hours, Plaintiff points to inconsistent evidence.  There are several

drivers during that same pay period who worked close to 80 regular hours, plus overtime: Jayme

Barber, Marian Conner, and Angela Gonzales.  Three other drivers, Glenda Vislosky, Torrey

Rose, and Kate Guffey worked more regular hours than Plaintiff, although they did not work any

overtime hours.  All of these were in-state drivers like Plaintiff, according to Defendant's

records.  Viewing the evidence in the light most favorable to Plaintiff, this calls into question

Defendant's explanation that it was trying to spread out regular hours and reduce overtime.

Defendant's second explanation that Plaintiff's requests not to work with other drivers

reduced the amount of runs for which she was eligible is also highly controverted.  Plaintiff

contends that there were only two other drivers that she refused to drive with.  While there were

a few others that she "requested" not to drive with, she continued to accept runs with them in

order to make her hours.  Additionally, there is no evidence about when Plaintiff lodged these

requests to determine if these were new or existing circumstances the week of October 12 when

her hours declined.  If they were not new, they would not explain the steep decline in her hours

during the month of October.  Moreover, the monthly run sheet indicates only one run that

Plaintiff turned down in October, on October 19, because she refused to ride with Paul Friegos.[92]

Finally, Defendant urges that Plaintiff's decline in hours was due to her failure to answer

calls for runs, her lack of availability, and her refusal to take certain runs offered to her.

Defendant offers availability sheets and run sheets from this pay period supporting its contention

that Plaintiff did not answer the phone, or refused runs offered to her.  Plaintiff states in her

affidavit that she always kept her cell phone nearby because she knew that was the only way to

---

[92]Doc. 90-2 at 29, Brokaw Aff., Ex. C.  Defendant submits two different versions of run sheets.  It submits
this monthly version of Plaintiff's runs as Exhibit C to the Brokaw Affidavit filed with the other exhibits in Doc. 90.
Defendant also submits daily run sheets with the Kokker Affidavit, filed as Doc. 85, that reflect the daily lists for all
drivers.  There is no explanation in the accompanying affidavits about who prepared the logs and when.

be notified of run opportunities.  She states that if she missed a call from STS, it was her practice to always immediately return the call.  Further, Plaintiff testified in her deposition and states in her affidavit that she did not refuse any offers for runs during that October 12–25 pay period. The Court is not to weigh the credibility of witnesses at the summary judgment stage.  A reasonable jury could believe Plaintiff that she did not refuse to accept the October runs.  If a jury believed Plaintiff's testimony, then it would render Defendant's stated reasons for the reduction in Plaintiff's hours false, permitting an inference that it is a pretext for retaliation. Accordingly, Defendant's motion for summary judgment on the retaliation claim is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Summary Judgment (Doc. 86) is denied.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 88) is granted in part and denied in part.  The motion is granted on Plaintiff's sexual harassment claim and denied on Plaintiff's retaliation claim.

Dated: November 23, 2015

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE